UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAURAV BANERJEE, *et al.*

                              Plaintiffs,

                -v-

ZHANGMEN EDUCATION INC., *et al.*,
                              Defendants.

21-CV-9634 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Saurav Banerjee, individually and on behalf of all other shareholders similarly situated, brings suit against Zhangmen Education, Inc., certain Zhangmen executives, Zhangmen's signatories associated with its first American public offering, and Zhangmen's underwriters for that public offering under the Securities Act of 1933.  Zhangmen, its executives, its signatories, and its underwriters all move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim.  For the reasons that follow, Defendants' motions are granted.

I.    **Background**

The following facts are drawn from the in Plaintiff's First Amended Complaint.  (*See* ECF No. 30 ("AC").)  This case concerns alleged misrepresentations in connection with the Initial Public Offering ("IPO") of American Depositary Shares ("ADSs") in Zhangmen Education, Inc. ("Zhangmen").  (*See* ECF No. 44 ("P. Opp.") at 1.)  Zhangmen filed a Registration Statement with the Securities and Exchange Commission ("SEC").  (*See* AC ¶ 24.)

Plaintiffs also sue certain Zhangmen executives:  Yi Zhang ("Zhang"), Zhangmen's co-founder and Chairman of its Board of Directors as well as Chief Executive Officer, (*see id.* ¶ 26); Ricky Kwok Yin Ng ("Ng"), a director and Chief Financial Officer of Zhangmen at the time of the IPO (*see id.* ¶ 27); and Teng Yu ("Yu"), Zhangmen's other co-founder and a director of

Zhangmen (together, the "Individual Defendants").  (*See id.* at ¶ 28.)   Plaintiffs further sue

Cogency Global, Inc.  ("Cogency Global"), and its Senior Vice President, Collen A. De Vries

("De Vries"), who served as Zhangmen's authorized agent in the United States in connection

with its IPO on the NYSE ("Cogency Defendants").  (*See id.* ¶¶ 31 – 32.)   Finally, Plaintiffs sue

Defendants Morgan Stanley & Co., LLC ("Morgan Stanley") and Credit Suisse Securities (USA)

LLC ("Credit Suisse"), as each served as underwriters for Zhangmen's IPO (the "Underwriter

Defendants.")  (*See id.* ¶ 43.)

> ### A.     Events Leading to Zhangmen's IPO

Zhangmen is a corporation doing all significant business in the People's Republic of

China ("PRC" or "China") and incorporated under the laws of the Cayman Islands.  (AC ¶ 2.)

Zhangmen was a leading one-on-one afterschool tutoring service provider for K-12 students in

China.  (AC ¶ 3.)  Zhangmen, like much of the Chinese afterschool online tutoring market,

"experienced explosive growth" in the years leading up to Zhangmen's IPO.  (AC ¶ 40.)

However, despite initial market success, Zhangmen was subject to repeated adverse regulatory

actions by PRC and similar Chinese Communist Party ("CCP" or "the Party") institutions.  (AC

¶ 4.)  The result was a "crackdown" on Zhangmen.  (*Id.*)  In November 2019, Zhangmen was

fined for violating Chinese laws against false advertising.  (*Id.*)  On January 7, 2021, the Chinese

Ministry of Education announced, without mentioning Zhangmen, that "great efforts would be

made to regulate and rectify after-school tutoring institutions."  (AC ¶ 46.)  Thus, Plaintiffs

allege that "[b]y January 2021, the CCP and PRC . . . made clear . . . that they would reform the

private tutoring markets in which Zhangmen operated."  (AC ¶ 44.)

A January 2021 communication from the CCP's Central Commission for Discipline

Inspection and the PRC's National Supervision Commission amounted to a "warning shot" that

Zhangmen's industry was in deep regulatory trouble, having "ran afoul of official policy."  (AC

¶ 45.)  Also in January 2021, the Office of Education Supervision Committee of the State Council had a video conference concerning education policy in which "a number of provincial education departments" argued that "reducing the 'Double Burden'" imposed by private off-campus tutoring companies was "the most important task for education supervision for 2021." (AC ¶ 47.)

On March 6, 2021, President Xi Jinping ("Xi") "confirmed that the PRC will 'resolutely reform all activities that infringe on [the People's] interests under the banner of education." (AC ¶ 48.)  Also, in March of that year at the Chinese People's Political Consultative Conference, President Xi allegedly went further, describing China's afterschool tutoring business as "a social problem." (*Id.*)  Xi's statements were of a general nature and were not about Zhangmen.  On March 17, 2021, Liang Tingfu, a scholar, warned of a "regulatory crackdown" in the industry which "might be more severe than ever."  (AC ¶ 48; ECF 40-3.)

In response to these events, Yu Minhong, a founder of one of Zhangmen's competitors, asserted that the "quick success sought by investors does not work in the education industry [in China], and a crackdown on online education, which . . . was full of 'chaotic misbehavior,' was 'imminent.'"  (AC ¶ 52; ECF No. 40-4 ("Exhibit 4").)  Minhong did not offer any statements, speculation, or opinions that were specific to Zhangmen.

### B.    Events Surrounding Zhangmen's IPO

On May 19, 2021, less than a month before the completion of the IPO, Zhangmen filed its first iteration of its Form F-1 registration statement with the SEC; this form identified Zhangmen as issuer and Defendants Morgan Stanley and Credit Suisse as underwriters, and was signed by Defendants Zhang, Ng, Yu, Cogency Global, and De Vries.  (AC ¶ 53.)  On May 21, 2021, Xi presided over a meeting of the Central Committee of the Chinese Communist Party. (AC ¶ 54.)  At this meeting, the Central Committee adopted a document titled "The Opinions of

Further Reducing the Burden of Homework and Off-Campus Tutoring for Students in the
Compulsory Education Period" ("Opinions"), which expressed "concerns that too much after-
school tutoring could affect students' physical and mental health," but otherwise remained non-
disclosed until July 23, 2021.  (*Id.*)  The Amended Complaint does not allege that this
information was available to the public or to any Defendant in this action prior to July 23, 2021.
On May 31, 2021, approximately one week before the IPO, Bloomberg published an English
language article citing Chinese experts and industry insiders; the article stated that at that time,
no one in the Chinese state apparatus or in the Communist Party had disclosed what, exactly, the
reforms of the educational industry would consist of.  (*See* ECF No. 40-6 ("Bloomberg
Article").)  Plaintiffs highlight that "[i]n light of these reforms," three "other Chinese EdTech
firms" made the choice to "scrap[] or postpone[] plans for [their own] initial public offerings."
(*Id.*)  But it is not alleged what specific reforms Plaintiffs refer to.

On June 1, 2023, the SAMR published an article announcing fines against 15 after-school
tutoring firms, including Zhangmen for the first time by name.  Plaintiffs provide one state media
article, which states that "Zhangmen.com was found to have exaggerated its number of
applicants, the background of its teachers and its 'magic' in accurately predicting the content of
examination papers for national college entrance exams."  (AC ¶ 56; ECF No. 40-6.)  There was
media perception in May and June 2021 that Zhangmen and its peer firms were being targeted
due to "anxieties" about health for students and financial burdens imposed on parents, and,
specifically, that the Chinese regulatory authorities were concerned with "misconduct such as
false advertising and difficulty in obtaining refunds for lesson fees."  (AC ¶ 57 (internal citation
omitted).)  This was the largest regulatory fine in Zhangmen's history.  (*See id.*)

Three days later, on June 4, 2021, Zhangmen filed its final amendment to the Registration Statement on Form F-1/A (the "Registration Statement") which included the final prospectus for investors (the "Prospectus") postdated on June 9, 2021.  (*See* AC ¶ 58.)  On June 7, Zhangmen then sent the SEC a formal request to accelerate the effectiveness of its Registration Statement to accommodate a June 8, 2021 IPO.  (AC ¶¶ 59, 60.)  The SEC declared Zhangmen's filing effective on June 8, 2021, and Zhangmen conducted its IPO on that day.  (AC ¶¶ 60, 62.)  It sold 4,166,450 ADSs at $11.50 per and raised $47.9 million in gross offering proceeds.  (*Id.*)

### C.    Events Following Zhangmen's IPO

On July 23, 2021, "China *unveiled* the implementing rules for the sweeping overhaul of its education sector" that published documents had referenced "at least since January 2021." (AC ¶ 78 (emphasis added).)  In a press release excerpted by Plaintiffs, Zhangmen informed investors at approximately this time that its entire business model was at serious risk, because China had functionally "bar[red] for-profit tutoring in core school subjects," which, in the words of one contemporaneous trade publication, "threaten[ed] to decimate China's $120 billion private tutoring industry and [to] trigger a heavy selloff in shares of tutoring firms traded in . . . New York."  (*Id.* (internal citations omitted).)  The result was that, by December 2021, shares sold on the NYSE had diminished in value to $1.50 — losing nearly 98% of their value since the July 2021 disclosures.  (AC ¶¶ 82, 83.)

### D.    Procedural Background

On November 21, 2021, Plaintiffs initiated this putative class action, with Saurav Banerjee as named Plaintiff, on behalf of similarly situated shareholders that purchased stock in connection with Zhangmen's IPO prior July 23, 2021.  Banerjee sued Zhangmen, the Individual Defendants, the Underwriter Defendants, and the Cogency Global Defendants.  (*See* ECF No. 1.)

On February 11, 2022, the Court issued an order appointing Yanhong Chen lead plaintiff for purposes of any claims covered by the PSLRA.  (*See* ECF No. 11.)

On April 12, 2022, Plaintiffs filed their first Amended Complaint (the "AC"), challenging the Registration Statement as materially misleading on several grounds.  (*See* ECF No. 30.) *First*, Plaintiffs attack the Registration Statement's optimistic predictions about earnings.  One typical statement was that "China's online K-12 one-on-one after-school tutoring market in terms of gross billings reached RMB 14.7 billion in 2020, and is expected further increase to [sic] RMB51.5 billion in 2025 . . . .  The online K-12 one-on-one after-school tutoring market is currently at an early development stage."  (AC ¶ 63.)  Plaintiffs contend that this statement was actively false or misleading, in that it claimed that the industry was "at an early development stage," but "in fact" it was "existentially threatened by regulatory reform[s] discussed openly in China since at least January 2021 . . . ." (AC ¶ 64.)  Plaintiffs further allege that this statement required additional clarifications from Defendants, explaining, first, that the industry's growth and profits were not based on anything that Zhangmen said but, rather, based on "false advertising and fraudulent pricing by Zhangmen and its competitors."  (*Id.*)  Plaintiffs contend that, considering the above, "Zhangmen and its peers had already been fined by Chinese regulators for such fraudulent practices" such that even if its statements about growth were true, that "growth had already reached a point where the burdens . . . imposed upon Chinese students and their families [were] oppressive and unsustainable."  (*Id.*)

*Second*, Plaintiffs challenge statements explaining Zhangmen's own specific income and growth.  One typical example of such a statement noted in the AC reads:

> **The success of our business model is evidenced by our rapid growth.**  Paid student enrollments of our online one-on-one after-school tutoring increased by 43.2% . . . [between 2019 and 2020], and by 52.2% . . . [within 2020 already].  Paid student enrollments

> of our online small-class after-school tutoring . . . represent[ed] a
> 222.6% growth . . . in the third quarter of 2020.  Our net revenues
> increased by 50.6% . . . [for 2020-21, compared to 2019-20
> numbers].  Our gross billings increased by 36.3% . . . [from 2019 to
> 2020] . . . and by 73.1%  . . . for the three months ended March 31,
> 2020 . . . for the same period in 2021.

(AC ¶ 65.)  This statement, and those like it, is alleged to be actively false or misleading for

similar reasons — Plaintiffs charge that the success of the business model came not from growth,

but, rather, from Zhangnem's non-disclosed "abusive" practices.  (AC ¶ 66.)

*Third*, Plaintiffs attack the statements that Zhangmen did make related to recent

regulatory developments ("Recent Development Statement") on the basis of omission liability.

Here, the challenged statement was:

> The State Council promulgated the amended Regulations on the
> Implementation of the Law for Promoting Private Education of the
> PRC on April 7, 2021 . . . which will become effective on September
> 1, 2021.  The Amended [Regulations] . . . require[] a private school
> engaging in online education activities using internet technology to
> obtain a private school operating permit.  As advised by our PRC
> counsel, Tian Yuan Law Firm, we may need to obtain the private
> school operating permit as an online tutoring service provider . . . .
> We intend to apply for this permit when the regulatory authorities
> issue detailed rules setting forth the level of government authorities
> in charge of permit review and issuance and when the government
> authorities start to accept applications around September 1, 2021. .
> . . Based on our consultation with relevant government authorities,
> as we have made the foregoing filings, ***we do not perceive material
> obstacles to use obtaining the private school operating permit***.

(AC ¶ 67 (emphasis in AC).)  Plaintiffs contend that Defendants were required to disclose that

"Zhangmen had placed itself in the crosshairs" by committing false advertising and fraudulent

pricing.  (AC ¶ 68.)  Plaintiffs assess that this statement was misleading because it failed to also

disclose "that the tutoring services hawked by Zhangmen imposed an oppressive time burden on

Chinese students . . . contravening . . . official policy."  (*Id.*)  Plaintiffs allege that the "timing of

Zhangmen's IPO" — and Zhangmen's request that the SEC move up its IPO date — "suggests

that Defendants did perceive at least a reasonable likelihood that there would be a material obstacle[] and were attempting to ensure the IPO closed before that obstacle materialized."  (*Id.*)

*Fourth*, Plaintiffs argue that all the challenged statements detailed above, even if insufficient alone to create Section 11 liability, are further proof that Defendants violated Item-303, which requires a firm issuing initial stock to disclose "known trends" and "uncertainties" that could have a material effect on its business.  (AC ¶¶ 71 – 75.)

## II.   Legal Standards

### A.   Motion to Dismiss[1]

To survive a motion under Rule 12(b)(6), a plaintiff allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Complaints have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court should dismiss a complaint where "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Courts must accept all allegations and draw all inferences for the plaintiff.  *See Steginsky v. Xcelera Inc*., 741 F.3 365, 368 (2d Cir. 2014).

### B.   Securities Act

A plaintiff suing under Sections 11, 12(a), and 15 of the Securities Act "need not plead scienter, reliance, or causation."  *In re Qudian Inc. Secs. Litig.*, 2019 WL 4735376, at *5 (S.D.N.Y. Sept. 27, 2019).  "Issuers are subject to 'virtually absolute' liability under section 11,

---

[1] The parties dispute whether only the Rule 12(b)(6) standard applies to this case, or the elevated pleading requirements of Rule 9(b) apply.  (*See* P. Opp. 15.)  The Court need not resolve this issue, because, for reasons explained below, it concludes dismissal is appropriate under Plaintiffs' standard, which is the exclusive one used in this opinion.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for

mere negligence." *In re Morgan Stanley Info Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)

(quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).  "When analyzing

offering materials for compliance with the securities laws, [courts] review the documents

holistically and in their entirety." *Morgan Stanley*, 592 F.3d at 365-66.  In cases raising claims

like this present one, the Second Circuit has directed that "two issues are central to omission

claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful

omission; and (2) materiality." *Id*. at 360.

   "Under Section 11, any person who acquired a security under a registration statement that

. . . 'omitted to state a material fact required to be stated therein or necessary to make the

statements therein not misleading' may sue every person who, *inter alia*, signed the registration

statement, served as a director or partner in the issuer, or acted as an underwriter with respect to

the security." *Garnett v. RLX Tech. Inc.*, 2022 WL 4632323, at *12 (S.D.N.Y. Sept. 30, 2022)

(Engelmayer, J.).  "Liability attaches to a security's issuer, its underwriter, and certain other

statutorily enumerated parties pursuant to section 11 . . . if any part of the operative registration

statements" contained such a misstatement or omission.  *In re ProShares Tr. Sec. Litig*., 728 F.3d

96, 101 (2d Cir. 2013) (internal quotation marks omitted)).  Taking these provisions together as

the rules governing initial stock offerings, the Securities Act "imposes strict liability on issuers

and signatories, and negligence liability on underwriters, where 'any part of the registration

statement, when such part became effective, contained an untrue statement of a material fact or

omitted . . . a material fact required to be stated therein [by law] or [which was] necessary to

make the statements . . . not misleading." *Barilli v. Sky Solar Holdings, Ltd*., 389 F. Supp. 3d

232, 249 (S.D.N.Y. 2019) (quoting (15 U.S.C. § 77k(a)).  Section 12(a) liability parallels Section

11 liability entirely; Section 15 provides for parallel liability for underwriters in an IPO on a more onerous negligence standard.  If liability does not lie under Section 11, liability under Sections 12(a) and 15 cannot lie either.  *See Garnett*, 2022 WL 4632323, at *12 (gathering cases and statutes).  To determine "whether an alleged omission was material in light of the information already disclosed to investors [or in the public domain], the courts of this Circuit [must] consider whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available."  *Barilli*, 389 F.Supp.3d at 250 (cleaned up) (all alterations added, but emphases in original) (quoting *ProShares*, 728 F.3d at 102); *accord Matrixx*, 563 U.S. at 38 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

"When analyzing offering materials," courts must "review the documents holistically and in their entirety."  *Morgan Stanley*, 592 F.3d at 365-66.  In cases raising claims like this one, "two issues are central to omission claims under sections 11 and 12(a)(2): (1) the existence of either a misstatement or an unlawful omission; and (2) materiality."  *Id*. at 360.

## III.   Discussion

### A.   Omissions Liability and Precautionary Statements at Pleading Stage

Generally, determining the materiality of a misstatement tends to be fact intensive. However, where, as here, a plaintiff relies entirely on omissions-based liability, there are additional rules that establish the outer limits to liability and impose particular pleading requirements because "[d]isclosure is not a rite of confession," and defendants have no freestanding duty "to disclose uncharged, unadjudicated wrongdoing."  *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  Thus, "[t]o plead a § 11 claim on the basis of an omission theory, a plaintiff must allege 'a legal obligation to disclose the allegedly omitted information.'"  *Gordon v. Tencent Music Ent. Grp.*,

2021 WL 9183821, at *3 (E.D.N.Y. March 31, 2021) (quoting *In re Merrill Lynch & Co., Inc.*

*Research Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003)).  Such a disclosure duty

can arise either (1) "when additional information is needed to make another statement, whether

required or voluntary, not misleading," or (2) when an external disclosure duty has been

"imposed by [some other] statute or regulation."  *In re Morgan Stanley Tech. Fund Sec. Litig.*,

643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009).

Omission liability can also, in even more limited circumstances, attach to opinion

statements.  Courts impose this limit because "Section 11's omissions clause . . . is not a general

disclosure requirement; it affords a cause of action only when an issuer's failure to include a

material fact has rendered a published statement misleading."  *Omnicare*, *Inc. v. Laborers Dist.*

*Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  To state a claim for omissions

liability based on an opinion statement under Section 11 sufficient to survive post-*Iqbal*, the

Court has been specific and clear:  a plaintiff "must identify particular (and material) facts going

to the basis for the issuer's opinion — facts about the inquiry the issuer did or did not conduct or

the knowledge it did or did not have — whose omission makes the opinion statement misleading

to a reasonable person reading the statement fairly and in context."  *Id.*

Even if a statement is otherwise materially misleading, if a defendant includes sufficient

cautionary language warning investors if the risk did transpire, then the precautionary disclosure

defeats any possible inference of materiality and dismissal is appropriate.  "A forward-looking

statement accompanied by sufficient cautionary language is not actionable because no reasonable

investor could have found the statement materially misleading."  *Iowa Pub. Emps. Retirement*

*Syst. v. MF Global, Ltd*., 620 F.3d 137, 141 (2d Cir. 2010).  This rule is a "corollary of the well-

established principle that a statement of omission must be considered in context" before a court

concludes it to be material. *Id*. Where such cautionary language is meaningful and specific, "it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency" and so an omission cannot be misleading. *Id.* at 141.

If the "bespeaks caution" doctrine does apply, then any "'alleged misrepresentations in a stock offering are immaterial as a matter of law [because] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language.'" *Qudian*, 2019 WL 4735376, at *5 (quoting *Halperin v. eBankerUSA.com*, 295 F.3d 352, 357 (2d Cir. 2002); 15 U.S.C. § 77z-2(c)(1)(A)(i)) (alteration in original). Rather, "[t]he doctrine may apply '[w]hen there is cautionary language in the disclosure." *Id*. (quoting *Rombach*, 355 F.3d at 173). And if it does apply, then the "touchstone of the inquiry is not whether isolated statements within a document were true but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id*. (quoting *Rombach*, 355 F.3d at 173).

## B.    Crackdown-Based Claims

The two main theories of liability advanced in the Amended Complaint are sufficiently similar that they can be treated alike for the purposes of analyzing whether Zhangmen's precautionary statements bar liability. This refers to the set of claims related to Zhangmen's Statements about the Market and Statements Explaining Income; both rely on the notion that Zhangmen was too optimistic about either its market or its income and, as a result, misled investors about the very real risks of bad investment outcomes, namely, that the PRC would establish a new permitting regime for afterschool tutoring and exclude Zhangmen from it. The Court assumes without deciding that Zhangmen has made colorable allegations that these statements are misleading and material.

Zhangmen's Registration Statement, however, included extensive precautionary disclosures of possible regulatory risks.  If these cautionary statements were sufficient to put reasonable investors on notice about the nature, extent, and magnitude of the adverse regulatory actions taken by the PRC after July 23, 2021, then, under the bespeaks caution doctrine, there can be no Section 11 liability because no later event or disclosure added to the mix of information available to the reasonable investor.  Here, Zhangmen's disclosure stated:

> **According to our consultation with relevant government authorities,** we do not perceive material obstacles for us to obtain a private school operating permit . . . . However, since the Amended Implementation Regulations . . . is **newly published and has not come into effect**, **the interpretation and implementation of such new law remain uncertain**, **we cannot assure you that we will be able to obtain a private school operating permit** and comply with other regulatory requirements under such new law . . . . If we are not able to comply with the licensing requirement in a timely manner or at all, we may be subject to fines, confiscation of the gains derived from our noncompliant operations, mandatory modifications to our business practices, **suspension of our non-compliant operations** or claims for compensation of any economic loss suffered by our students or other relevant parties.

(AC ¶ 39 (emphasis added).)  This portion of the Registration Statement — flagged as an important "**WARNING**" in bold text on the first page — went on, warning investors that one possible outcome could be orders to suspend Zhangnem's operations or go out of business:

> **According to the media report** [the same one referenced in the AC], it was mentioned at the most recent meeting held by the Comprehensive Deepening Reform Committee that measures should be taken to reduce the after-school academic burden on primary and secondary school students. Such proposed measures include: (i) strictly enforcing regulations against after-school tutoring institutions that fail to meet the relevant qualifications, have chaotic management, utilize unscrupulous tactics to collect money, utilize false advertising or collude with schools for inappropriate profit; (ii) setting appropriate fees standards to be charged by after-school tutoring institutions and strengthening the supervision of pre-payments by students; (iv) **prohibiting inappropriate capital activities and profiteering in the after-school tutoring industry**; and (iv) improving legislation to regulate the after-school tutoring

institutions. On June 2, 2021, the PRC government issued another article, which provides that the MOE's Double Burden Reduction Special Work Office will work with relevant government authorities [toward] . . . : (i) improving the teaching quality of schools and controlling the total amount of written homework; (ii) increasing the quantity and quality of after-school services . . . ; and (iii) strengthening the governance of after-school tutoring institutions by examining and approving the establishment of after-school tutoring institutions, strengthening the supervision of training content, innovating methods of tuition fee management, standardizing training behavior, investigating and penalizing illegal training behaviors, and safeguarding the rights and interests of parents and students. **As the full context of the Opinions has not yet been published, there is material uncertainty with respect to its interpretation and implementation and potential impacts on online tutoring service providers like us. We cannot preclude the risk that we may be subject to fines, penalties or regulatory orders, including orders to suspend our operations or to adjust or substantially limit our operations in various aspects (including advertising, fee standards or course schedule)**, . . . which may materially and adversely affect our business, financial conditions and results of operations.

(ECF No. 40-1 ("Registration Statement"), at 4 (emphasis added).)  Defendants continued:

As the Online After-School Training Opinions and the other laws and regulations discussed above **are relatively new and evolving, we cannot assure you that we are in full compliance with all relevant rules**. The relevant governmental authorities have significant discretion in interpreting and implementing, and may, from time to time, conduct inspections on our compliance with such laws and regulations and their relevant local implementation rules. **Failure to comply with these applicable regulatory requirements or promptly complete filings may subject us to fines, regulatory orders to suspend our operations or other regulatory and disciplinary sanctions.**

(Registration Statement at 22 (emphasis added).)

For bespeaks caution to bar liability, the "cautionary language . . . pertain[ed] to the specific risk that was realized." *Gregory v. ProNAI Therapeutics Inc*., 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018) (citing *In re Delcath Sys., Inc. Sec. Litig*., 36 F.Supp.3d 320, 333 (S.D.N.Y. 2014)).  While true that language that is forward-looking but "vague or mere boilerplate" fails as

a matter of law to bespeak caution, the language here is more specific and particular than other warnings the Second Circuit has held to be adequate. *Gregory*, 297 F.Supp.3d at 397 (quoting *Slayton v. Am. Expr. Co.*, 604 F.3d 758, 772 (2d Cir. 2010)). And there is no question that the above-quoted cautionary statements do "directly relate to the risk that brought about the plaintiff's loss" in a manner sufficiently clear as to put a reasonable investor on notice of the risk. *Gregory*, 297 F.Supp.3d at 398 (quoting *Halperin*, 295 F.3d at 359).

Precautionary statements render any allegedly misleading omission immaterial as a matter of law, and so are appropriate as reasons for dismissal at the motion to dismiss stage, when, considered in the context of the materials as a whole, the precautionary statements were sufficient such that it could not "be supposed by a reasonable investor that the future is settled, or unattended by contingency." *MF Global*, 620 F.3d at 141. Here, that standard is met. Because the harm allegedly was repeatedly, adequately disclosed in the offering papers, the Court concludes that Zhangmen's disclosures rendered any misleading statement it may have made immaterial. The bespeaks caution doctrine is a sufficient reason to conclude that Plaintiffs have failed to state a claim as a matter of law. *See Garnett,* 2022 WL 4632323, at *19 (dismissing a similar case against a Chinese e-cigarette manufacturer where, post-IPO, the Chinese government cracked down so as to render the industry nonexistent because the defendant noted the possibility of such a crackdown and plaintiff pleaded no facts showing that such a crackdown was a "foregone conclusion," or even known or inevitable, at the time of defendant's offering-related statements); *Halperin*, 295 F.3d at 359 – 60 (offering materials adequately warned of the risk where the materials "explicitly warned of this risk" and mentioned potential registration with "hortatory language . . . surrounded by warnings that registration cannot be assured").

Recent cases in this circuit buttress the Court's conclusion here.  In *Gordon v. Tencent Music Entertainment Group*, the plaintiffs sued Tencent Music because, weeks after its American IPO, Tencent's once-profitable stock turned toxic due to the announcement of an industry-ending regulatory crackdown — there, regarding the music streaming business. *Gordon*, 2021 WL 9183821 at *1 – *2.  Judge LaShann DeArcy Hall, dismissing the complaint, had reason to consider a wealth of Chinese crackdown cases and formulated general principles. Concerning disclosures that were less clear and emphatic than Zhangmen's here, Judge Hall concluded that "there is no allegation to support the claim that any investigation [or crackdown] would materially impact [the defendant]."  *Id.*; *see also id.* at *6 (holding that disclosures less specific and tonally grave than Zhangmen's, such as the defendant's statements that it was facing "substantial uncertainty as to whether some of our current licensing arrangements may be found objectionable by the regulatory authorities in the future" were not misleading as a matter of law). In *Gordon*, as here, the defendants were informed of a possible Chinese regulatory investigation, but they were not singled out — they were treated as just one undifferentiated firm in the industry.  *Id.*  This was so even though, as in this case, the Chinese authorities levied new fines shortly before the IPO; and the defendant was summoned to a meeting, along with all other industry competitors, in which Chinese authorities chastised the firms much closer in time to the IPO, but did not announce any specific regulatory sanctions, fines, or other penalties levied on any firm.

This case is also similar to *Garnett v. RLX Technology, Inc.*, in which Judge Paul Engelmayer built on Judge Hall's analysis to dismiss yet another Chinese crackdown securities suit.  2022 WL 4632323.  Here, too, the Amended Complaint "does not plausibly plead a misleading statement or omission because the Offering Materials adequately disclosed the

possibility of stricter regulations—indeed, the possible outright prohibition—of [an entire industry] in China." *Id.* at *18. *Garnett* concerned a Chinese electronic cigarette manufacture, which had an IPO at a time of booming profits and exponential growth but which, following the IPO, was subject to such a regulatory onslaught by the CCP that its stock became worthless. *Id.*

Here, as Judge Engelmayer put it, the "bespeaks caution doctrine protects [offering] statements . . . which would not have left any reasonable investor with the impression that, as to enhanced regulation of [online tutoring] in China, 'the future was settled, or unattended by contingency." *Id.* (quoting *MF Global*, 620 F.3d at 141 – 42). Even if it is true that Zhangmen was so optimistic about its market in China or its own income streams as to cause a reasonable investor to overlook the chance of a crackdown, Zhangmen adequately bespoke caution with respect to this risk in clear, prominent, and definitive language, and it is the risk that materialized.

Plaintiffs' response is that Defendant's cautionary statements were themselves insufficiently dire and pessimistic, and thus misleading.[2] (P. Opp. at 15 – 20.) However, that reframing fails to resuscitate the claim. "The fact that [Zhangmen] summarized the applicable regulations at a high level of generality rather than providing a detailed accounting of each provision (or quoting it verbatim) does not make the Registration Statement misleading."

_____

[2] Plaintiffs fault the Registration Statement for (1) omitting "the most serious statements that regulators had already made, including that 'great efforts would be made to regulate and rectify after-school tutoring institutions," (P. Opp., at 13); (2) omitting that the "reforms were not just threatened by . . . bureaucrats, but . . . by . . . Xi himself," (*id*.); (3) omitting that "Zhangmen already had contravened the official policy of the PRC" by imposing the Double Burden, (P. Opp. at 14); (4) omitting that the CCP had made "reforming abuses at private tutoring companies" a regulatory "centerpiece," (*id*.); (5) omitting that "Chinese authorities had already signaled they would ban profit making by after-school tutoring companies," (*id*.); (6) omitting the SAMR fines issued in early June; (7) failing to clarify that it was not just "uncertain" but "highly unlikely" that Zhangmen would receive a permit." (*Id*.)

*Qudian*, 2019 WL 4735376 at \*7 (citing *In re Progress Energy, Inc. Sec. Litig.*, 371 F.Supp.2d 548, 552-53 (S.D.N.Y. 2005)).  Rather, "the securities laws do not require disclosure of information that is publicly known . . . or which constitutes generally applicable laws and regulations . . . .  The federal securities laws simply do not require the excruciatingly lengthy and complicated disclosure that would result if every indicia of the modern regulatory state needed to be compiled, catalogued, and explained to potential investors."  *Id.* at \*7 (quoting *Progress Energy*, 371 F.Supp.2d at 552-53 (internal quotation marks omitted)); *accord In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F.Supp.3d 1283, 1288 (S.D. Fla. 2021) (dismissing claim against IPO defendant because it is not required that a defendant issuing stock "catalogue *every* single law—proposed and enacted—in every jurisdiction in which it operate[s]").  Another outcome would vitiate authority.  It is well established that the general rule is that "[c]ompanies subject to government regulation are not required to speculate or foresee coming regulation or its potential effect on the company."  *Kwalburn v. Glenayre Techs., Inc.*, 201 F.3d 431, 431 (2d Cir. 1999).

Additionally, the warnings that were present were quite emphatic and dire:  Zhangmen's "warnings, which went so far as to warn of the possible future prohibition [of profit-making in Defendant's entire industry], were sufficient to pick up the regulatory risk that later materialized: that China would decide to" take regulatory action essentially ending any ability for an entire sector to make profit.  *Garnett*, 2022 WL 4632323 at \*19; *see also Qudian*, 2019 WL 4735376, at \*6 (dismissing allegations of misleading statements and omissions regarding defendant's regulatory compliance because defendant's offering materials said expressly that the relevant regulatory framework was "evolving" and "inconsistently" applied, and further warned that its business practices could be found to violate Chinese laws, with adverse effects on the company).

Finally, Plaintiffs ask the court to draw an inference that because Defendants (a) knew about prior adverse SAMR actions against Zhangmen (from 2019 and January 2021) and (b) took action themselves shortly after receiving their relatively small fine from SAMR in early June to expedite the date of the offering, this permits an inference of liability.  This argument fails.  First, the various replies and other sorts of communiques with Chinese regulators, based on what Plaintiff chose to include in the Amended Complaint, merely show "an indication" among them "toward heightened regulation, but left unclear the timing and form of such regulations–or whether, within the Chinese national government, the [Commission's] preferred approach would even carry the day." *Garnett*, 2022 WL 4632323 at *19.  Indeed, Plaintiffs' claims do not follow:  "[T]hat China had taken other regulatory actions in this space did not assert this particular legal outcome." *Id*. at *20.  Plaintiffs do not plead allegations that support the "central fact" that Plaintiffs claim the Offering Materials failed to disclose: that the laws and rules enacted on July 23, 2021, were "inevitable–imminent and a fait accompli" at the time that Zhangmen released its final Registration Statement and began its offering, between June 7th and 8th. *Id*. at *20.

Because Zhangmen did disclose the possibility of adverse Chinese regulatory actions, and disclosed the possibility that they would be existential, and warned that such a crackdown would not necessarily require the government to enact new law, among other things, "[n]o more disclosure about potential regulatory developments was required." *Id*. at *20.

### C.     Claim Based on Recent Regulatory Development Statements

Plaintiffs also challenge Zhangmen's specific statements regarding the most recent SAMR investigation and the June 1, 2021, fine and suggest that these claims are independent of their more general allegations about the forthcoming crackdowns.  (P. Opp. at 17.)  The specific language Plaintiffs identify as misleading reads:

19

> [H]istorically, we had been subject to fines imposed by relevant governmental authority for making misleading advertisements and promotions (including recently with respect to certain inappropriate advertisements concerning the enrollment, faculty, content, effectiveness, and pricing of our courses) and had been ordered to remove such advertisements and promotions.

(P. Opp. at 18 (quoting AC ¶ 76).)

First, for the reasons addressed above, in context of the whole of Zhangmen's offering materials, this adequately disclosed the risk that Plaintiffs now complain of.  That is because the Amended Complaint advances only one theory of damages:  Plaintiffs seek damages based on the July 23, 2021 collapse of the stock price, triggered by a risk that was disclosed adequately.  And Zhangmen supplemented these overarching disclosures of risk with particular disclosures of fines related to false advertising and fraudulent/illegal pricing, including that one such fine had been levied "recently."  Indeed, given the disclosures of the recent fines and the other disclosures, Plaintiffs "'at most plead[] that the defendants disclosed an investigation was ongoing, but refused to provide more details,'" which is insufficient, without more, as a matter of law under Section 11.  *In re XP Inc. Sec. Litig.*, 524 F. Supp. 3d 23, 39 (E.D.N.Y. 2021) (quoting *In re Investment Tech. Grp.*, *Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 617 (S.D.N.Y. 2017)).

Even if these disclosures were inadequate, dismissal would still be warranted.  In order for a defendant to have a duty to disclose, there must be some material, non-public information that would significantly alter the mix of information for the reasonable investor.  But here, allegations in the Amended Complaint fall short of establishing that the SAMR fine is material in a manner that would trigger a disclosure obligation in the first instance.

There is no duty to disclose all details of regulatory fines, even fines imposed in close proximity to registration statements; rather, an issuer has a duty to disclose only those fines that are material to the company.  *See* SEC Form F-1, Item 4(a); SEC Form 20-F, Items 5(d), 8(a)(7)

(requiring disclosure of regulatory fines if they "may have, or have had in the recent past, *significant effects* on the company's financial position or profitability"). Instead, "the existence of 'a government investigation, *without more*, does not trigger a generalized duty to disclose'" as a matter of law. *Gordon*, 2021 WL 9183821, at *5 (quoting *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016)) (emphasis added).

Courts assess the qualitative and quantitative materiality of a fine's impact on a defendant to determine whether there is an operative disclosure obligation. *See XP*, 524 F. Supp. 3d at 39 n. 9. Plaintiffs disclaim any quantitative basis for materiality. (*See* P. Opp. at 15 – 20.) Though it may have been the largest fine in Zhangmen's short corporate history, that is probative exclusively to Zhangmen's relatively upstanding tenure, because the fine, valued at most at $390,170 U.S. dollars,[3] is negligible compared to Zhangmen's value. Instead, Plaintiffs explain their materiality argument (without using the language of qualitative materiality as required by this circuit's cases) in one short sentence: "Although the nominal amount of the fine may not have been financially devastating to Zhangmen, there is no question that a reasonable investor could have found the devastating findings, levied  days before the IPO by a powerful national regulator charged with investigating abusive practices within the industry President Xi promised to 'resolutely reform' to significantly alter the total mix of information available." (P. Opp. at 19 (quoting *Matrixx Initiatives*, 563 U.S. at 44-46).) Because Plaintiffs do not then isolate and explain how it satisfies the factors that the Second Circuit has identified as denoting qualitative materiality, they fail to sufficiently allege materiality. In other words, the above-quoted sentence

---

[3] The Amended Complaint inaccurately describes the fine as about $1.5 million. That figure is still not material but is also contradicted by Plaintiffs' source, which clearly states that Plaintiffs' figure is the sum of fines imposed on Zhangmen and three competitors. (*See* Issuer Memo, at 20 n. 15.)

is merely a conclusory statement, and Plaintiffs fail to plead facts permitting a plausible inference of its truth.

Nor could Plaintiffs do so, because the Court concludes that there is no basis to plausibly infer quantitative materiality from the well-pleaded allegations in the Amended Complaint. Courts assess qualitative materiality by reference to factors such as (i) "concealment of an unlawful transaction," (ii) the "significance of the misstatement in relation to the company's operations," and (iii) "management's expectations that the misstatement will result in a significant market reaction." *ECA & Local 134 IBEW Jt. Pension Tr. of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 197-98 (2d Cir. 2009) (quoting SEC Staff Bulletin No. 99, 64 Fed. Reg. 45150, 45150-52 (1999)).  As to the first factor, Zhangmen did not conceal the fine; it disclosed it in its Statement.  As to the second factor, in part because the cost of the fine is so minimal for a firm like Zhangmen, which Plaintiffs themselves claim was worth at least $600 million in 2020, it would be unreasonable to infer that the misstatement was "significant" to the firm's operations as it related to advertising but Zhangmen is not in the advertising business. And as to the third factor, Plaintiffs cannot show it because they explicitly disclaim that any part of the Amended Complaint made any allegation about any Defendants' knowledge.  (P. Opp. at 8 – 13.)  The Court concludes that the allegations about the SAMR fine "fall well short of the standard for quantitative materiality, and plaintiffs . . . point[] to no factors that would indicate qualitative materiality."  *XP*, 524 F. Supp. 3d at 39 n. 9.

Plaintiffs' attempts to resuscitate this claim are unavailing.  First, Plaintiffs argue that there was an additional duty imposed on Zhangmen because this fine was issued by the SAMR, which allegedly signals the fine as more "serious" because the SAMR is "the most powerful national market regulator in China" (P. Opp. at 18), and that because Xi was involved in this

policy choice, that too signals that this was more "serious." (*Id.*)  But the conclusion of this argument does not follow from its premises.  That the institution issuing a fine is an important regulator does not make a specific fine material if all other materiality factors are lacking.

Plaintiffs then challenge Zhangmen's precise word choice, arguing that it was not just a fine for "inappropriate" advertising but, rather, one for "illegal" advertising.  (P. Opp. at 18.)  But this argument is purely semantic:  When lawyers speak of fines being levied against a person or entity, those fines issue because a state institution has found the person or entity to have violated a legal rule (i.e., to have engaged in illegal conduct).  Plaintiffs emphasize that Defendants should have disclosed that this was the largest fine that the SAMR was authorized to levy for this sort of legal violation.  (P. Opp. at 18 – 19.)  If so, all this suggests is that China does not see this infraction as "material" or "significant," because it has attached minimal costs to it.

> **D.      Opinion Claim**

Plaintiffs also articulate a claim based on Zhangmen's statements about the likelihood of its receipt of an operating permit after the June 1, 2021 SAMR fine as unlawfully misleading opinion statements.  Plaintiffs refer to the following statement as one of opinion:

> We intend to apply for this permit when the regulatory authorities issue detailed rules setting forth the level of government authorities in charge of permit review and issuance and when the government authorities start to accept applications around September 1, 2021. We have already made filings with the regulatory authorities as an online after-school training institution according to Implementation Opinions on Regulating Online After-School Training issued by the Ministry of Education, together with certain other PRC government authorities, in 2019. **Based on our consultation with relevant government authorities, as we have made the foregoing filings, we do not perceive material obstacles to us obtaining the private school operating permit.**

(Registration Statement at 4 (emphasis added).)

This claim also fails.  First, it is not meaningfully different than the above arguments that the Court has considered and rejected.  The (lack of) issuing of permits for business operation is just the mechanism by which the Chinese government choked out Zhangmen's business.  Because Zhangmen adequately bespoke caution as to this risk, the same disclosures addressed above warrant dismissal of these claims because investors were similarly "warn[ed] of the specific contingency that lies at the heart of the alleged misrepresentation." *Gregory P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

Even if that were not the case, these allegations would fail to state a claim of opinion statement liability.  A statement of opinion is "actionable if it: (1) falsely describes the speaker's subjective beliefs; (2) embeds an untrue statement of fact; or (3) omits to state facts necessary to make the statement of opinion not misleading from the perspective of the reasonable investor." *Omnicare*, 575 U.S. at 184 – 86.  None of these paths to liability is applicable.  Zhangmen was clear that if this is an opinion statement, it is one based on its consultations with (1) its own lawyers and (2) relevant PRC regulators.  The Amended Complaint does not plead that either of these consultations did not occur or that Zhangmen's belief was substantially based on anything but them.  Plaintiffs, moreover, fail to isolate a misstatement regarding permitting specifically: At no point does the Amended Complaint allege that Zhangmen represented permitting as a done deal, nor do Plaintiffs claim it did.  Rather, Zhangmen stated that it believed it was "likely" to receive permitting under the then-unknown set of regulations that were pending and undisclosed at the time of the IPO on a disclosed basis.  (*Id.*)

### E.    Item 303 Trend Statement Claims

The SEC's Interpretive Release concerning Item 303 interprets the standard to mean that a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the

registrant's financial condition or results of operation."  Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Company Disclosures, Securities Act Release No. 6835, Exchange Act Release No. 26831, Investment Company Act Release No. 16961, 43 SEC Docket 1330 at *4 (May 18, 1989); *see also Stratte McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

This portion of the Amended Complaint is dismissed for three independent reasons. First, courts in this district have dismissed residual Item 303 claims where, as here, they are mere "redundant" restatements of otherwise-failed Section 11 complaints due to the clear overlap in standards.  *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018).

Second, Plaintiffs allege no misstatement or omission *separate* from the rest of their allegations, and *unique* to Item 303, to support any inference of falsity or omission.  Here, however, as discussed in the context of Plaintiffs' main claims above, all that Plaintiffs have alleged is that there were multiple investigations and rule-making initiatives ongoing at the time of the IPO.  Thus, "as other courts in this circuit have found," the 303 claim should be dismissed because "the alleged existence of an investigation alone does not support an inference that the company 'expected or reasonably should have expected that it would later incur fines or liabilities (or both) that would impact its future financial results materially.'"  *Gordon*, 2021 WL 9183821, at *7 (quoting *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 81, 82-84 (S.D.N.Y. 2015)) (citing *Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915 at *10 (N.D.N.Y. March 27, 2020)).

Further, Defendants complied with Item 303's disclosure obligations:  They did disclose all negative events, trends, and the like associated with adverse Chinese government actions at

the time of their IPO.  Courts hold this to be sufficient disclosure of a "trend" of adverse governmental actions.  *See Rubinstein v. Credit Suisse Grp., AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020); *Schaffer*, 2018 WL 481883, at *3.

Finally, if all the known parts of an Item 303 "trend" *are* effectively disclosed, *then* Item 303 liability can *be established* by satisfying a "soft" knowledge element.  This requirement is not a robust scienter standard, but 303 claims are subject to the requirement that, at minimum, a trend be "known" to a defendant when the alleged wrongful statements occurred.  *See id.* at *3 (dismissing claim of violation under Item 303 where plaintiffs "fail[ed] to identify any adverse economic event or trend that occurred prior to the Offering that was not disclosed in the Offering Documents" and failed to plead "with any specificity, facts establishing that [the defendants] possessed any actual knowledge of the purported 'trend' or 'event.'").  The Amended Complaint is premised on disavowing any allegation of knowledge in favor of "negligence," and Plaintiffs cannot satisfy this standard.

## IV.    Conclusion

For the foregoing reasons, Defendant Zhangmen Education, Inc.'s motion to dismiss is GRANTED.

As this motion dismisses the predicate claims of liability under Section 11 applicable to all other Defendants, the Court also dismisses (1) all other claims against Officer Defendants Yi Zhang, Ricky Kwok Yin Ng, and Teng Yu; (2) all other claims against Signatory Defendants Cogency Global, Inc. and Collen A. De Vries; and (3) all claims against the Underwriter Defendants Morgan Stanley & Company LLC and Credit Suisse Securities (USA) LLC.  Accordingly, the claims against all Defendants are DISMISSED with prejudice.

The Clerk of Court is directed to close the motions at ECF Numbers 38 and 41.  The

Clerk of the Court is further directed to enter judgment for Defendants and to close this case.

SO ORDERED.

Dated: March 30, 2023
      New York, New York

_____
J. PAUL OETKEN
United States District Judge